### MARTIN *vs.* THE STATE.

[INDICTMENT FOR UNVEIGLING SLAVE.]

1. *Admission implied from silence, or failure to reply to slave's declarations.* A declaration, made by a slave to his master, in the presence of the prisoner, accusing the latter of a crime for which the master was at the time threatening to arrest him, under circumstances which justified the suspicion of his guilt, and to which he made no reply, is admissible evidence against him, as an implied admission on his part of the truth of the charge.

2. *Same; admissibility of evidence prima facie incompetent.*—Where a slave's declaration to his master, in the presence of the prisoner, is proved to have been made under circumstances which render it competent evidence against the prisoner, as an implied admission by him of its truth; and it is also shown that the declaration was made in the slave's ordinary tone of voice, which was "usually low and not very distinct," so that the master "was sometimes compelled to ask him to repeat what he said,"—the prisoner cannot be allowed to prove "that it would be more difficult for a stranger, or a person unacquainted with the slave, to understand him," unless he also offers to show that he was himself a stranger to the slave.

3. *Stealing or inveigling slave; constituents of offense.*—Under an indict-
ment which charges that the prisoner "inveigled, stole, carried, or
enticed away a slave," (Code, § 3130,) the court may refuse to instruct
the jury, at the instance of the prisoner, "that if the evidence showed
that the slave refused to go with the defendant, and did not leave
the premises or the possession of his owner, then they should find the
defendant not guilty:" such charge is calculated to mislead the jury,
by inducing them to believe that the slave's consent to go, and his
leaving the premises of his owner, are necessary to constitute the
offense of larceny by the defendant.

FROM the City Court of Montgomery.
Tried before the Hon. B. S. BIBB.

THE indictment in this case was found at the October
term, 1864, and charged that the prisoner, John Martin,
"inveigled, stole, carried, or enticed away, a slave named
Fred, the property of Charles S. L. Peasley, with intent to
convert said slave to his own use, or to enable said slave to
reach a State or country where he would enjoy freedom."
The defendant pleaded not guilty, and was tried at the
same term. "On the trial," as the bill of exceptions states,
"the State introduced one Peasley as a witness, who testi-
fied, that on a Saturday night in September, 1864, about
eleven o'clock, he was aroused from sleep by a negro
woman, who stated that 'there was a white man trying to steal
Fred;' that he (witness) lived in the city of Montgomery,
and Fred lived on an adjoining lot; that Fred was a slave,
and belonged to his wife, but was in his possession, and
under his control; that he went down to the house, where
Fred resided with the negro woman as his wife; that when
he arrived at the house, he saw the defendant have Fred
in the yard, standing over him, with a stick raised, but did
not have his hands on him, and heard him say to Fred,
'Put on your shoes, and come quick, or I will drop you;'
that the defendant saw him about that time, and made off,
but he went up to him, and asked him what he was doing
there; that the defendant replied, 'he was an impressing
officer, and was impressing negroes.' Witness said, 'You
know that is not so; that will not do this time of night.'
Defendant then asked witness, what he wanted with him;
and witness replied, that he wanted him to go to jail.

Martin v. The State.

Defendant refused to go, and said that he wanted to go to the provost-marshal. Witness then asked him, what he was doing with the slave; to which he replied, that he wanted 'to appropriate him to his own use,' or 'to take him,' or words to that effect; that he 'was going to take said slave to the front,' and that there were eleven others engaged in the same business. Defendant objected to the admission of the foregoing conversation as evidence, and to the declarations of the defendant. The court overruled the objection, and the defendant excepted.

"Said witness further testified, that the slave Fred told him, in the presence of the defendant, that the defendant wanted him to go off with him; to which declaration of the slave the defendant made no reply. Witness further stated, that when the slave made use of the above remark, he was within three feet of the witness, and within six or seven feet of the defendant; and that the slave spoke in his ordinary tone. Defendant objected to said declarations of the slave, as evidence against him, and reserved an exception to the overruling of his objection. Said witness further testified, on cross examination, that the slave usually spoke in a low tone of voice; that he was not very distinct in his conversation generally; and that he (witness) was often compelled to ask him to repeat what he had said. Defendant's counsel then asked said witness, if it would not be still more difficult for a stranger, or a person unacquainted with the slave, to understand him. Objection being made to this question by the State, the court sustained the objection; to which the defendant excepted.

"Said witness stated, also, that the negro woman who went after him was living in the same house with Fred, as his wife, in a house which was about fifty feet from the street; that Fred always went to bed about nine o'clock; that when he (witness) reached the house, the defendant and Fred were in the yard, about five or six steps from the house; that he took the defendant by the collar, and led him out of the yard; that Fred picked up two brick-bats, and perhaps threw one at the defendant; that the defendant appeared to be intoxicated, and was boisterous and noisy on the way to the guard-house; and that all the

above took place in the county of Montgomery, in September, 1864. There was, also, other testimony in the cause.

"The court thereupon charged the jury, that the consent of the slave to abandon his master's service was not necessary to be shown, before a conviction could be had under the indictment; and that the slightest removal of said slave by the defendant, though against the slave's consent, with a view of converting said slave to his own use, was a carrying away in legal contemplation. The defendant excepted to this charge, and requested the court to instruct the jury, among other charges, that if the evidence showed that said slave refused to go with said defendant, and did not leave the premises or the possession of his owner, then they should find the defendant not guilty. The court refused this charge, and the defendant excepted to its refusal."

"The defendant requested the court to instruct the jury, also, that, although they might believe that the defendant had the intent, and did attempt to entice, inveigle, steal, or carry away said slave, unless that intent was consummated by an actual carrying away of said slave, or an actual determination on said slave's mind to leave his master's service, followed by acts evidencing that intention, they must find the defendant not guilty. The court gave this charge, and the jury thereupon retired. The jury returned into court in a short time, and asked an explanation of the charge of the court as to carrying away; and the court thereupon instructed them, that if the slave was removed by the defendant, with a felonious intent to convert said slave to his own use, though against the slave's consent, this amounted to a carrying away under the law. To this charge the defendant excepted."

No counsel appeared for the prisoner in this court.

M. A. BALDWIN, Attorney-General, for the State.

STONE, J.—The declaration of the slave, made in the presence of the defendant, in connection with the accompanying fact of the defendant's silence, was, it seems to us, competent evidence. This court very properly held, in *Spencer v. The State*, (20 Ala. 24,) that there was no general

rule prohibiting the admission in evidence, against a white man, of a slave's declarations, made in his presence, and which were of such a character, and made under such circumstances, as naturally to call for a reply. This court further decided, in *Clawson v. Wiley*, (35 Ala. 328,) that the declaration having been made in the presence of the party, the question whether he heard it was for the determination of the jury. The declaration in this case was made by the slave, in the presence of his master and the defendant. The master had just been drawn from his house, by a representation that the defendant was attempting to carry off his slave. It was night, and the defendant was found upon the master's premises, addressing the negro. The master threatened to take the defendant to jail. The slave told his master that the defendant wished him to go off with him. If the defendant was innocent, it would have been a most obvious and natural impulse, as well as a dictate of interest, for him to repel the accusation, and thus attempt to vindicate his character. It was not the case of insulting language, used in passion immediately after a fight, as in the case of *Fuller v. Dean*, 31 Ala. 654. It was a grave accusation, made by a slave to his master, for the information of the latter, when the master was menacing the defendant with an arrest for his imputed crime. It might be, of course, that the defendant was innocent of the specific charge, and had some other purpose in going on the premises, and preferred rather to lie under the accusation made, than to disclose his real object. Of this it was the province of the jury to decide. The evidence was admissible, and that was the only matter for the court.

[2.] The jury were required to decide whether the prisoner heard the slave's declaration. It was right, therefore, that they should be informed of the distance intervening between the two at the time of the declaration, and of the tone in which the declarant spoke, and that the master was frequently compelled, by the low tone and indistinctness of his conversation, to ask a repetition of what he had said. After this evidence was given to the jury, the court refused to permit the witness to answer, whether it would not be more difficult for a stranger to understand the slave.

We are inclined to hold, that if the testimony had tended to show that the accused was a stranger to the slave, this evidence should have gone to the jury. There are persons who, from some peculiarity of voice, are less intelligible to strangers, than to those accustomed to hear them speak; and if this slave had that peculiarity, it would be right the jury should know it, while passing on the question, whether a declaration, made by the slave, was heard by one who was a stranger to him. But the record does not inform us that the accused was a stranger to the slave, or that there was any evidence before the jury which tended to establish that proposition.

The inquiry has suggested itself to us, does the law raise any presumption on this question? Or, in other words, can we presume that the accused was, or was not, a stranger to the slave? We think the law raises no presumption in the case. We presume, as the record is silent on the question, that there was no evidence before the jury bearing on the inquiry, whether the defendant was or was not a stranger to the slave. In the absence of all presumptions and testimony on this point, it is manifest that any proof which might have been elicited in response to the question propounded, would have been irrelevant and immaterial. As well prove that a deaf man cannot hear as well as one whose organs of hearing are sound, when there is no proof that the accused has any imperfection of hearing. Whenever the record fails to show affirmatively that the excepting party has been injured by the ruling of the primary court, it is our duty to presume everything, not inconsistent with the statements of the record, in favor of the correctness of the court's rulings. Such has been our uniform practice.—See *Thompson v. Drake*, 32 Ala. 99; *Smith v. Gafford*, 33 Ala. 168-174; *Thomas v. De Graffenreid*, 17 Ala. 602; *Nash v. Shrader*, 27 Ala. 377; *Gillespie v. Burleson*, 28 Ala. 551; *Doe, ex dem. v. Godwin*, 30 Ala. 242.

Lest what we have said above may mislead, we will remark, that when the testimony offered is *prima facie* pertinent and relevant to the issue, then the rule stated above does not apply. It is only when the relevancy of the rejected testimony depends on the proof of some preliminary

fact, that the party complaining of error in the rejection of such testimony must show affirmatively that such preliminary proof was made.—See *Thompson v. Drake, supra.*

[3.] If the defendant, by persuasion, artifice, or force, induced the slave to remove, or removed him from the particular place or spot where he was, with either of the intents mentioned in the statute, (Code, § 3130,) then he is guilty. But, to constitute the offense, there must be more than a mere unexecuted intention or wish to remove. Some act of removal, pursuant to such intention or wish, must be done. But it does not matter how far such act progresses. It is effect, as contra-distinguished from unexecuted intention, or mere attempt, which constitutes the offense in such cases. When force is the means by which the removal is effected, the consent of the slave's mind to the removal is not a necessary ingredient of the crime. It is otherwise when inveigling or enticing is the means.

We have made the above remarks as introductory to what we design saying in reference to the charge refused. The city court declined to give the following charge, asked by defendant: "That if the evidence showed that said slave refused to go with the said defendant, and did not leave the premises or the possession of his owner, then the jury should find the defendant not guilty." It will be observed, that this charge covers, in terms, each form of the indictment,— that for stealing, as well as that for inveigling or enticing. If it had been given, it would have been the duty of the jury, on the hypothesis stated, to have acquitted the defendant absolutely, of each and every charge preferred against him.

It may be, and doubtless is true, that every larceny implies, to some extent, a dispossessing of the owner of his property. Mr. Russell says, (vol. 2, p. 5,) "There must be an actual taking, or severance of the goods, from the possession of the owner, on the ground that larceny includes a trespass." By this, however, the author only means what, in law-phrase, is called the *asportavit*—the carrying away. Any, the slightest removal, *animo furandi*, meets the requirements of the law; is an *asportavit*, a taking of posession, and dispossesses the owner.—See 2 Russell on Crimes, 5;

*Spivey v. State*, 26 Ala. 99; *Mooney v. State*, 8 Ala. 328. Nor, indeed, is it necessary that the owner should have had the actual possession of the slave stolen. The possession may be through a bailee, or may be mere constructive possession.—*Spivey v. State*, 26 Ala. 101. Or, if the slave be runaway and outlying at the time of the taking and carrying away, he is sufficiently in the possession of his owner to constitute the taking a dispossessing of the owner of his goods.—See *Murray v. State*, 18 Ala. 727. See, also, as to what constitutes a "carrying away" in the crime of larceny, Wharton's American Criminal Law, § 1810.

To say that larceny can not be consummated, unless the property leaves, or is taken out of, the possession of the owner, even if these words stood alone, is not very accurate. Any removal, *animo furandi*, as we have shown above, of goods from the spot where they are found, is a sufficient taking from the possession of the owner, to perfect the crime; and this, notwithstanding the goods be not taken off the premises, or out of the house of the owner. The true meaning of the rule is, that the offender must acquire, at least for a moment, the possession, the dominion, control, or direction of the thing, and must carry it away; must make some change in its local *situs*. Hence, if the charge requested had simply been, "that unless the slave left the possession of his owner, the jury should find the defendant not guilty," it admits of doubt whether such charge would not have had a tendency to mislead the jury, unless some explanatory charge had accompanied it, defining what is meant by the words, *leaving the possession of the owner*.

But we need not decide this question. The charge asked and refused does not present it in the simple form supposed. It contains three clauses—namely: "If the evidence showed that said slave refused to go with the said defendant, and did not leave the premises or the possession of the owner." Now, under no circumstances, could the guilt of the defendant depend on the fact, whether the slave did or did not leave the *premises* of his owner. If he was removed, *animo furandi*, from one place or spot to another, even if both places or spots were on the premises of his owner, the crime was complete. But a removal from the premises of the

owner, without such felonious intent, could not constitute the crime.

So, of the first branch of the charge, namely: "If the evidence showed that said slave refused to go with said defendant." The question of the consent of the slave could not be material on the general inquiry of guilty *vel non*. It might have been material on the inquiry, whether the defendant was guilty of inveigling or enticing; for the consent of the slave was a necessary ingredient in that crime. Not so, however, of the crime of larceny, or stealing. The charge was asked, not in a restricted form, but in the general form. The court was asked to charge the jury, that, on the facts supposed, they should find the defendant not guilty. If it had been given, the jury must have been misled thereby, in this, that they would have regarded the consent or willingness of the slave to go, and his leaving the premises of his owner, as important inquiries in the investigation of the facts. This would have tended to multiply the issues before the jury, and to embarrass their deliberations. It is settled in this State, that a charge which requires explanation or modification, is calculated to mislead the jury, and should be refused.—Shepherd's Digest, 462, §§ 61–2. A charge, which assumes that an immaterial question of fact is an issue to be tried and determined by the jury, is calculated to mislead them, by withdrawing their minds from the true issues before them.—See *Dunlap v. Robinson*, 28 Ala. 400; *Edgar v. McArn*, 22 Ala. 796.

We do not think there is any error in the rulings of the city court, available to the defendant.

The judgment is affirmed.